IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |  |
|---|---|---|
| DEVRICK GAIL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No.  3:25-cv-383–HEH |
| | ) | |
| CHADWICK DOTSON, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION
### (Granting Respondent's Motion to Dismiss)

Devrick R. Gail ("Gail"), a Virginia inmate proceeding *pro se,* filed this petition

for a writ of habeas corpus under 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1)

challenging his convictions in the Circuit Court for City of Richmond for the murder of

Davon Daniels and the use of firearm in the commission of that offense.  Gail's primary

claim for relief is that one of his two defense counsel, who represented him at trial,

labored under a conflict of interest because he previously worked for the

Commonwealth's Attorney Office for the City of Richmond at the time of Daniels's

murder.[1]  Gail asserts that he is entitled to relief on the following grounds:

> 1.    Trial Counsel, Christopher Bradshaw and Thomas Barbour, had a conflict of interest in their representation of the petitioner as Mr. Barbour had represented the Commonwealth in two substantially related matters, infringing on the petitioner's Sixth Amendment right to counsel.

---

[1] The Court employs the pagination assigned by CM/ECF.  The Court corrects the spelling, punctuation, and capitalization and omits emphasis in the quotations from the parties' submissions.  Including, the name of the potential witness, Jamie Phillips.

   For ease of reference, the Court utilizes the number system for Gail's claims as employed by Respondent in his Motion to Dismiss. (ECF No. 15, at 14–16.)

a. Mr. Barbour prosecuted the petitioner on the initial conspiracy charge related to the murder of Daniels.

b. Mr. Barbour prosecuted Jamie Phillips on a weapons charge that was substantially related to Daniels's homicide investigation.

2. Appellate counsel was ineffective:

A. Appellate counsel was ineffective for failing to raise the issue of trial counsel's conflict of interest on appeal.

B. Appellate counsel was ineffective for failing to raise the issue of:

  i. prosecutorial misconduct in relation to perjured testimony of Barbee and

  ii. the failure to preserve exculpatory evidence and

  iii. allowing Wilson to commit perjury.

3. Petitioner's Sixth Amendment right to confrontation was denied by the Circuit Court's admission of the victim's dying declaration and the court's refusal to permit impeachment of the victim, and appellate counsel was ineffective for failing to raise the issue of the petitioner's right to confrontation regarding the dying declaration and impeachment of the victim.

Respondent has moved to dismiss. Gail has responded. For the reasons that follow, the Motion to Dismiss (ECF No. 14) will be granted.

## I. Applicable Constraints Upon Federal Habeas Review

To obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") further circumscribes this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

## II. Initial Procedural History

The Court of Appeals of Virginia aptly summarized the evidence of Gail's guilt as follows:

> On the morning of January 2, 2018, Davon Daniels and his girlfriend, Alexus Barbee, were in their bedroom watching television when they heard "a very loud knock" at their apartment door. Barbee remained in the bedroom while Daniels answered the door. Barbee overheard Daniels ask, "Who is it?" She then heard a voice respond, "It's me, it's Quan." Barbee recognized the voice as Gail's. She was familiar with Gail's voice because he had visited Daniels and Barbee in their apartment "[e]veryday" for the preceding two months. From the bedroom, Barbee heard Daniels and Gail talking. After a couple of minutes, Barbee heard gunshots, followed by Daniels calling out to her. Barbee ran into the living room and found Daniels alone, face down on the floor. He told her he had been shot and to call 911.
>
> During the recorded 911 call, the 911 dispatcher asked Barbee who had shot Daniels. Barbee spoke with Daniels and asked him, "Who?" Daniels answered, "Quan," and Barbee repeated Quan's name.[2]
>
> Barbee placed the 911 call at 11:22 a.m. Officer M. Bryson reached the apartment at 11:24 a.m.; his body-worn camera recorded his entry into the building and his interaction with Barbee. When Bryson arrived, Daniels was alive and "shaking." Barbee, who was on the floor next to Daniels,

---

[2] At trial, the 911 call was played for the jury. The record includes a transcript of the 911 call that was not admitted into evidence.

related that Daniels had told her "Quan" was the shooter. Bryson's body-worn camera continued to record Barbee as she spoke on the phone and told a third party that "Quan" had shot Daniels.

Firefighters reached the apartment shortly after Bryson. Daniels had a "very faint pulse" when they arrived, but his heart stopped, and by the time he reached a local hospital, he was pronounced dead. An autopsy revealed that Daniels had been shot in the back multiple times, perforating his heart and lung.

Surveillance cameras at Barbee's apartment complex recorded a black Ford Fusion arriving at the parking lot outside her building at approximately 10:42 a.m. on the morning of the murder. After approximately fifteen minutes, Gail and Deondre Wilson exited the black car and entered Barbee's building at 10:58 a.m.

At trial, Wilson identified himself and Gail in the footage. Wilson testified that they entered the building together, but Wilson knocked on his grandmother's first-floor apartment door while Gail approached the stairs. Wilson testified that Daniels's apartment was at the top of the stairs. Wilson saw no one other than Gail in the interior hallway, and the stairwell was open to the first floor. Upon hearing gunfire, Wilson fled from the building and waited outside until he saw Gail exit behind him. Surveillance footage showed Gail and Wilson walking away briskly in opposite directions; neither man returned to the Ford Fusion. When the police searched the Ford Fusion, they found mail and a rental agreement bearing Gail's name.

Four bullet casings were recovered from the murder scene and submitted for forensic analysis. Subsequent forensic analysis determined that each casing was fired from the same gun, possibly a Glock. The casings were compared to a Glock recovered the next day from another apartment building in the same complex following the police pursuit of an individual named Jamie Phillips, but forensic analysis eliminated that gun as the murder weapon.

(ECF No. 15-5, at 2–4.) In rejecting Gail's contention that the evidence was insufficient to demonstrate that he shot and killed Daniels, the Court of Appeals of Virginia concluded that "the evidence was competent, credible, and sufficient to prove beyond a reasonable doubt that Gail was guilty of first-degree murder and use of a firearm in the commission of a felony." (ECF No. 15-5, at 4–8 (alterations in original).) Gail was

4

sentenced to life imprisonment on the murder charge and three years of imprisonment on the firearm charge. (ECF No. 15-1, at 1.)

### III. Alleged Conflict of Interest

Gail was represented at trial by Christopher Bradshaw and Thomas Barbour. Gail contends that Barbour had a conflict of interest created by his former role as Assistant Commonwealth's Attorney.

The Sixth Amendment guarantee of effective assistance of counsel "requires meaningful compliance with the duty of loyalty and the duty to avoid conflicts of interest, and a breach of these basic duties can lead to ineffective representation." *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991); *United States v. Nicholson* ("*Nicholson I*"), 475 F.3d 241, 249 (4th Cir. 2007). Specifically, Petitioner must show "that (1) petitioner's lawyer operated under a 'conflict of interest' and (2) such conflict 'adversely affected his lawyer's performance.'" *United States v. Nicholson* ("*Nicholson II*"), 611 F.3d 191, 205 (4th Cir. 2010) (internal citation omitted).

To establish a conflict of interest, Gail must demonstrate that his and counsel's "interests diverged with respect to a material factual or legal issue or to a course of action." *Nicholson II*, 611 F.3d at 215 (quoting *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir. 1998)). To establish an adverse effect, Gail must satisfy, a three-part standard which requires he: 1) identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued; 2) show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision; and 3) establish that the defense counsel's failure to pursue

5

that strategy or tactic was linked to the actual conflict. *Mickens v. Taylor*, 240 F.3d 348

(4th Cir. 2001), *aff'd* 535 U.S. 162 (2002).

### A. Claim 1(a)

In Claim 1(a), Gail contends that Barbour had an actual conflict of interest because,

while Barbour was employed by the Commonwealth, he

> did in fact prosecute the Petitioner Devrick Gail for conspiracy to commit the first-degree murder of Davon Daniels and use of a firearm in the commission of a felony homicide of Davon Daniels . . . and [] Barbour did represent the Commonwealth through [] Mr. Gail['s] indictment for first degree murder of Davon Daniels and use of a firearm in the commission of the felony homicide of Davon Daniels.

(ECF No. 1, at 20.) Prior to being indicted for the first-degree murder of Davon Daniels,

Gail had been indicted on the charge of conspiracy to murder Davon Daniels. The

conspiracy to murder Davon Daniels charge was subsequently dismissed. Essentially, in

Claim 1(a), Gail contends that counsel had a conflict because (1) he was the actual

prosecutor on the initial conspiracy related charges against Gail and (2) he was still

employed by Commonwealth's Attorney Office at the time when the murder and firearm

indictments were filed. Both aspects of this claim lack factual merit.

> In rejecting the first aspect of this claim, the Supreme Court of Virginia found:

> portions of claims (1) and (4) are factually without merit. The record, including the February 23, 2018 order dismissing the conspiracy charge against petitioner, demonstrates Barbour was not the prosecutor who moved to withdraw the charge. Instead, it appears Christine Cestaro, who, along with Kirk Conway, represented the Commonwealth in petitioner's prosecution for murder and use of a firearm in the commission of a felony, moved to withdraw the original conspiracy charge.

6

(ECF No. 1, at 64–65.)  Additionally, with respect to the second aspect of this claim, the Court of Appeals of Virginia found that, "Barbour did not continue to represent the Commonwealth through the time of Gail's arraignment, nor does Gail allege as much." (ECF No. 15-5, at 17.)  Gail has not provided the Court with clear and convincing evidence, *see* 28 U.S.C. § 2254(e)(1), which rebut these findings.  Accordingly, Claim 1(a) lacks factual merit and will be dismissed.

## B. Claim 1(b)

In Claim 1(b), Gail contends that Barbour had a conflict of interest because he was previously employed by the Commonwealth and prosecuted Jamie Phillips on a weapons charge that was substantially related to Daniels's homicide investigation.  (ECF No. 1, at 63–64.)  Gail raised some aspects of this claim on direct appeal and again on state habeas.  In rejecting aspects of this claim, the Court of Appeals of Virginia found that "the mere fact that Barbour represented the Commonwealth in a limited manner in an unrelated criminal investigation does not rise to the level of an apparent conflict of interest," because "Barbour did not continue to represent the Commonwealth through the time of Gail's arraignment, nor does Gail allege as much." (ECF No. 15-5, at 16–17 (alterations and omission in original).)  Barbour's prior employment by the Commonwealth's Attorney and work on Phillips's case created a *potential* conflict of interest.  *See Chandler v. Lee*, 89 F. App'x 830, 841 (4th Cir. 2004) (internal citations omitted).  However, Barbour must show that potential conflict ripened into an actual conflict that impaired Barbour's advocacy.  As explained below, he has not done so.

### 2. Alleged Adverse Effects Related to Barbour's Involvement with the Phillips Investigation and Prosecution

Gail asserts that Barbour's conflict adversely affected his right to counsel for the six following reasons (henceforth the "Adverse Effects"):

> A. Defense counsel did not seek disclosure of emails and Richmond Police Department reports that were exculpatory because the conflict of interest prevented them from doing so.
>
> B. Defense counsel did not sufficiently cross-examine Alexus Barbee about her involvement in a robbery with Phillips, about her lying to the police "under oath" when they interviewed her about the robbery, nor about her claim that she received nothing for testifying because Barbour had an impermissible conflict of interest that prevented him from acting contrary to the Commonwealth's interests.
>
> C. Defense counsel did not elicit sufficient information from defense witnesses, police officers Kevin Hughes and Amira Sleem, to suggest that Phillips possessed a weapon and killed Daniels because Barbour obtained the information through confidential communication with the witnesses and his conflict of interest prevented him from acting on this information.
>
> D. Defense counsel were ineffective for failing to impeach Davon Daniels with prior crimes of moral turpitude, denying the petitioner his Sixth Amendment right to confrontation, likely influenced by the conflict of interest.
>
> E. Defense counsel failed to investigate and subpoena Jamie Phillips, who would have testified that the petitioner did not have a gun and did not kill Daniels, likely because of Barbour's conflict of interest.
>
> F. Defense counsel failed to hire experts to examine 911 audio, apartment complex videos, and the jail video recording of Wilson's visit.

(ECF No. 15, at 14–15; *see* ECF No. 1, at 22–28.)

The Court of Appeals of Virginia, and the Supreme Court of Virginia addressed various aspects of this claim on direct and collateral appeal. At trial, Gail called Detective Sleem as a defense witness to testify about a gun recovered near the crime scene the day after the murder, though forensic analysis had already excluded it as the

8

murder weapon. A complication arose when the Commonwealth revealed that Gail's co-defense counsel, Barbour, a former Commonwealth's attorney, had previously investigated and dismissed firearm charges against the gun's possessor, Jamie Phillips. Defense counsel acknowledged awareness of the potential conflict, conducted a conflict-of-interest analysis, concluded none existed, and confirmed on the record that Gail had been advised of the situation and consented to proceed with Barbour as his counsel.

After conviction, Gail moved to set aside the verdict, arguing that Barbour's prior involvement with the Phillips case created a conflict that prevented him from subpoenaing Phillips as a potentially exculpatory witness, and that the Commonwealth had withheld an email chain between Barbour and Sleem regarding the Phillips investigation. The Commonwealth countered that Gail's attorneys had been informed of the characteristics of Phillips weapon before trial, that Phillips was actually present at trial and available to testify, and that the gun had been forensically excluded as the murder weapon. The Commonwealth also disputed Gail's claim that a jailhouse visit with co-defendant Wilson had been recorded, noting the jail's recording system had malfunctioned that day — a fact a prior defense attorney had been given funds to verify. The trial court denied the motion. (ECF No. 15-5, at 8–12 (alterations in original) (footnote number altered).)

### (a) Attributing Guilt to Phillips

Gail contends, as he did on direct appeal, "that Barbour's former employment as a Commonwealth's attorney played a role in the Commonwealth's failure to disclose the

9

email chain between Barbour and Sleem until after trial . . . ." (ECF No. 15-5, at 18.)[3] Relatedly, Gail contends that counsel did not elicit sufficient information from defense witnesses, police officers Kevin Hughes and Amira Sleem, to suggest that Phillips possessed a weapon and killed Daniels. *See* Adverse Effect C *supra.* Gail assumes that Barbour somehow obtained information through confidential communication with the witnesses and his conflict of interest prevented him from acting on this information. Finally, Gail contends counsel failed to investigate and subpoena Phillips, who would have testified that Gail did not have a gun and did not kill Daniels, likely because of Barbour's conflict of interest. *See* Adverse Effect E *supra.*

In rejecting Gail's first contention, the Court of Appeals of Virginia found that the forensic examination of Phillips's gun determined conclusively that it did not fire the casings found in Daniels's apartment, that the Commonwealth disclosed the investigation into that weapon and Phillips to Gail before trial. The Court concluded that the record therefore did not support Gail's *Brady* argument because the Commonwealth disclosed the general parameters of the Phillips firearm investigation to him before trial and because the specific email evidence relating to that investigation was not exculpatory. (*Id.* at 19–20.)

Here, Gail contends that counsel failed to pursue evidence that would have suggested Phillips was the murderer of Daniels. See Adverse Effect A, C, *supra.* However, it was undisputed that the gun found in Phillips's apartment was not the

---

[3] On direct appeal, Gail also raised the failure to turn over the emails prior to trial as a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

weapon used to kill Daniels. Furthermore, Phillips was subpoenaed by the Commonwealth and appeared for both days of trial. (Cir. Ct. R. 689, 1558.) Defense counsel, after speaking with Phillips, decided not to call him as a witness. (Cir. Ct. R. 1558.)

Counsel already had enough evidence to disparage the quality of the investigation and suggest that, initially, the police were unsure as to who had shot and killed Daniels.[4] Had counsel called Phillips he would have denied shooting Daniels and would only have diminished the credibility of the defense in the eyes of jury. Gail fails to demonstrate that counsel failed to pursue further attempts to implicate Phillips, or the evidence mentioned here by Gail, because of any potential conflict of interest.

The Court notes that, subsequent to the submission of his § 2254 Petition, Gail submitted a statement purportedly from Jamie Phillips. Contrary to theory expressed by Gail above, Gail does not suggest Phillips was willing to implicate himself as murderer. Instead, Phillips states in sum, "I would have been willing to testify that Gail didn't have a weapon and he did not shoot or kill Davon." (ECF No. 9, at 3.) The statement fails to include any details indicating how Phillips would be privy to that information. Additionally, Phillips does not suggest he conveyed this information to Gail's defense

---

[4] In closing argument, defense counsel was able to argue about the firearm found at Phillips apartment that "the police believed that that was the weapon that was used to kill Davon Daniels. It turned out, of course, not to be the weapon. So they don't want to talk about it. But nonetheless, that's what they thought at the time." (Cir. Ct. R. 1210–11.)

11

counsel. Gail fails to demonstrate the counsel did not call Phillips because of any conflict of interest.[5]

### (b) Alleged Limited Cross-Examination of Barbee

Gail suggests that counsel conducted a limited cross-examination of Barbee because of his conflict of interest.[6] *See* Adverse Effect B, *supra.* Gail notes that Barbee and "Phillips were codefendants on a robbery and assault charge . . . that Jamie Phillips masterminded . . . . This would have established a motive why Jamie Phillips may have wanted to harm Alexus Barbee or anyone associated with her namely the decedent, Davon Daniels." (ECF No. 1, at 23.)[7] It was hardly reasonable for counsel to pursue a line of cross-examination suggesting that Phillips went to Barbee's apartment to kill her and then simply killed Daniels instead.

Next, Gail suggests that counsel failed to adequately cross-examine Barbee when she allegedly lied and "testified she was not given anything." (*Id.*) Gail does not direct

---

[5] Furthermore, the statement does not bear a jurat indicating it was sworn before a notary, instead, the document was merely acknowledged before a notary. (ECF No. 9, at 3.) *See Strong v. Johnson*, 495 F.3d 134, 140 (4th Cir. 2007) (explaining that jurat uses words "subscribed and sworn" and demonstrates an oath was administered); *Goode v. Gray*, No. 3:07cv189, 2009 WL 255829, at *2 n.6 (E.D. Va. Feb. 3, 2009). Additionally, the notary's commission had expired on May 31, 2025, before the statement was executed on June 17, 2025. (ECF No. 9, at 3.) Lastly, Gail fails to explain how the Court can consider Phillips's statement when it was never presented to the Supreme Court of Virginia. *Valentino v. Clarke*, 972 F.3d 560, 575 (4th Cir. 2020)

[6] Initially, the Court notes that Ms. Barbee's cross-examination was conducted by Mr. Bradshaw, rather than Mr. Barbour. (Cir. Ct. R. 832.) Gail also has submitted a CD recording of Barbee's police interview in an unrelated robbery and an assault case. (ECF No. 7.) The interview reflects the police already had substantial evidence implicating Phillips in the unrelated robbery charge.

[7] On state habeas, the Supreme Court of Virginia found that Petitioner failed to explain why the jury needed to hear whether Barbee told the police about the charges she incurred with Phillips, nor does he explain the grounds on which counsel should have objected to the trial court's ruling. (ECF No. 1, at 68.)

the Court to where this statement was made and where Barbee was provided immunity for any testimony. Indeed, the record reflects that when defense counsel asked her, Barbee acknowledged that she had received money from either the Commonwealth's Attorney or the Virginia Victim's Fund. (Cir. Ct. R. 851.) On redirect, Barbee acknowledged this money was paid because she had been forced to move because of threats associated with the murder of Daniels, to cover for her cell phone costs so she could contact the police and to pay for a hotel/housing during the trial. (Cir. Ct. R. 852–53.) Gail fails to demonstrate that counsel curtailed his investigation or examination of Barbee because of a conflict of interest.

### (c) Failure to Impeach Daniels

Next, Gail contends that counsel "failed to impeach . . . Daniels with crimes of moral turpitude." (ECF No. 1, at 25.); *see* Adverse Effect D, *supra*. Gail contends that Daniels was a member of a gang and had multiple drug and weapons violations. (*Id.*) After Daniels's dying declaration was recited to the jury, defense counsel attempted to introduce the name and nature of Daniels's felony convictions and his misdemeanors involving moral turpitude. (Cir. Ct. R. 970.) The Circuit Court denied the request. (*Id.* at 979.)

Defense counsel also sought to elicit information that Daniels was an active member of the Double I Blood Gangs through the testimony of Sgt. Skinner. (*Id.* at 1095.) The Circuit Court concluded that this testimony, as offered through Sgt. Skinner was inadmissible hearsay. (*Id.* at 1099–1100.) Gail fails to demonstrate the lack of

13

impeachment he urges here is attributable to counsel's alleged conflict of interest rather than the prohibitions of the Circuit Court.

### (d) Failure to Hire Experts

Finally, Gail contends that, because of his conflict of interest, counsel failed to hire experts to challenge the 911 recording, the video recordings from the apartment complex, and the recording from Richmond City Jail, where Wilson "openly admitted to lying to police about implicating the Petitioner in the homicide of Davon Daniels." (ECF No. 1, at 28.); *see* Adverse Effect F, *supra*. Gail fails to plausibly suggest how expert review of the video recordings from the apartment complex could have benefitted the defense. Gail was unquestionably present at the apartment complex at the time of the murder. With respect to the 911 recording and the jail conversation, in rejecting the version of this claim presented on state habeas the Supreme Court of Virginia found that the "Petitioner failed to explain how . . . hiring an expert would help in locating a recording that was never made" and that "the 9-1-1 call was not "altered" and petitioner does not explain why counsel should have examined this recording or how counsel's examination would have benefitted Petitioner . . . ." (ECF No. 1, at 74.) Gail fails to demonstrate that any failure to pursue the experts he urges here was attributable to any alleged conflict by defense counsel.

Gail fails to demonstrate that the potential conflict of counsel ever ripened into an actual conflict of interest that adversely affected counsel's performance. Gail makes no coherent showing as to why his interests and Barbour's ever diverged. By the time of Gail's trial, neither Barbour nor the record suggests that Barbour's performance was

14

impaired by continuing loyalty to the prosecution or any confidential information he obtained during his prior employment. Claims 1(a) and 1(b) will be dismissed.

### IV. Alleged Ineffective Assistance of Appellate Counsel (Claim 2)

In Claim 2, Gail contends appellate counsel was deficient for failing to raise various issues on appeal. "In order to establish a claim that appellate counsel was ineffective for failing to pursue a claim on direct appeal, the applicant must normally demonstrate" that appellate counsel performed deficiently and that a reasonable probability of a different result exists. *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). Counsel had no obligation to assert all non-frivolous issues on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). "[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Bell*, 236 F.3d at 164 (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)).

Here, Gail faults counsel for failing to raise on appeal: (A) the conflict of trial counsel discussed in Claims 1(a) and 1(b); and (B) prosecutorial misconduct in relation to (i) the perjured testimony of Barbee; (ii) the failure to preserve exculpatory evidence in the form of the recording of Wilson's visit to Gail at the Richmond City Jail; and (iii) allowing Wilson to commit perjury.

15

Gail has not demonstrated deficiency or prejudice with respect to appellate counsel's failure to raise the conflict of trial counsel. Such a claim lacks merit for the reasons discussed above. Accordingly, Claim 2(A) will be dismissed.

In Claim 2(B)(i), Gail contends that appellate counsel should have raised the fact that Barbee allegedly perjured herself by denying that she had a plea agreement with respect to her robbery charges. Gail fails to direct the Court to evidence that indicates appellate counsel had evidence to support such a claim. Accordingly, Claim 2(B)(i) will be dismissed because Gail fails to demonstrate deficiency or prejudice.

Next, in Claims 2(B)(ii) and 2(B)(iii), Gail faults appellate counsel for the failure to preserve exculpatory evidence in the form of the recording of Wilson's visit to Gail at the Richmond City Jail and allowing Wilson to commit perjury. Appellate counsel had no evidence to support either of these charges. As noted previously, the recording of Wilson's visit to Gail at the Richmond City Jail did not exist because the recording equipment was malfunctioning and nothing in the record, besides Gail's allegations, indicated Wilson committed perjury.[8] Gail fails to demonstrate deficiency or prejudice. Claims 2(B)(ii) and 2(B)(iii) will be dismissed.

### V. Admission of Daniels's Dying Declaration (Claim 3)

In Claim 3, Gail "asserts that the trial court's admission of the victim's testimonial statements as a dying declaration and denial of the Petitioner's trial counsel's [attempt] to

---

[8] Wilson acknowledged that a condition of bond for his pending criminal charges was that he appear and testify for the Commonwealth in Gail's criminal case. (Cir. Ct. R. 922–23.) Gail fails to demonstrate that Wilson lied about a plea agreement or any other fact.

impeach victim's testimonial statement with crimes of moral turpitude violated the Petitioner's Sixth Amendment right to confrontation." (ECF No. 1, at 47.) Gail failed to raise the federal constitutional aspects of this claim at trial and on direct appeal.[9] If Gail attempted to raise the claim now, the Supreme Court of Virginia would find the claim procedurally defaulted under the rule of *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974). *See Mu'Min v. Pruett*, 125 F.3d 192, 195–96 (4th Cir. 1997). Thus, the claim is barred from review here, absent a showing of cause and prejudice. *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). Gail suggests the ineffective assistance of trial and appellate counsel constitutes cause to excuse his default. (ECF No. 1, at 50–51.)

Gail fails to demonstrate that appellate counsel acted in a constitutionally deficient manner by failing to raise this claim. *See Woods v. Cook*, 960 F.3d 295, 300 (6th Cir. 2020) (rejecting the contention that admission of dying declaration violated the Confrontation Clause); *Thompson v. Nagy*, No. 18-1747, 2018 WL 8731570, at *3 (6th Cir. Nov. 20, 2018) (concluding appellate counsel did not perform deficiently by failing to challenge admission of dying declaration as violating the Confrontation Clause). Because Gail fails to demonstrate cause to excuse his default, Claim 3 will be dismissed as procedurally defaulted and is barred from review here.

## VI. Conclusion

Gail's claims will be dismissed. The Motion to Dismiss (ECF No. 14) will be granted. The § 2254 Petition will be denied. Gail's request for an evidentiary hearing

---

[9] Gail challenged the admission of Daniel's dying declaration on direct appeal as violative of state law. (ECF No. 15-5, at 20–21.)

17

will be denied.  The action will be dismissed.  A certificate of appealability will be denied.

An appropriate Final Order will accompany this Memorandum Opinion.

_____ /s/

Henry E. Hudson
Senior United States District Judge

Date: March 31, 2026
Richmond, Virginia

18